numbers 2012, 1663, and 1664 will be heard together as a single case. But before we get to the argued cases, we have two motions. The first of these is by Judge Rehn. Thank you, Judge Geig. Members of the court, I move for admission of David Ferentz, who is a member of the bar in good standing of the highest court in New Mexico. I have knowledge of his credentials and I am satisfied that he possesses the necessary qualifications. David, could you stand, please? So, David, you're very close to ending your clerkship with me. In fact, it's a few days away and I think it's very fitting that we honor you on this day with your admission to this great and honorable court. I say fitting because you've been a partner, not only as a clerk in my chambers, but to the entire court. You've been a contributor. You've been a giver much more than a taker. And your work is outstanding and has been, and I know that before me stands an excellent practitioner with a bright future ahead. So, on behalf of all the members of my chamber, I say thank you. And since you're from New Mexico, I also say vaya con Dios, buen caballero. Okay, Judge Rehn, your motion is granted. I welcome you to the bar of the court. Now, I have a motion. I'd ask Judge Prost to preside. And I will turn it over to Judge Dyke for his motion. I move the admission of three of my law clerks this morning. Hanina Zechariah Levine, who's a member of the bar of good standing of the highest court of Maryland. Jessica Elizabeth Palmer, who's a member of the bar in good standing of the highest court of New York. And Christopher Suarez, who's a member of the bar in good standing of the highest court of Illinois. I have knowledge of their credentials, and I'm satisfied that each of them possesses the necessary qualifications. Now, these are three of my law clerks this year, and the fourth is Chris Breyer, who's not yet eligible to take the oath. He'll do that at a later time. But I want to thank all four of them this morning for their really outstanding work in my chambers this year. It's a sad time of year when we come to the end of the sittings for the year before they depart. But this has been an unusually good year, and each of you has done a really outstanding job. I'm very appreciative, and I look forward to seeing great success from each of you in the coming years. That's one of the great satisfactions of being a judge is to see how successful your law clerks become and how much they contribute to the society and to the development of the patent law and to the patent litigation and other types of litigation as well. So thank you all very much, and welcome to the bar. The motion is granted, Enthusiastic. Congratulations, and welcome to the bar of the United States Court of Appeals. All right. Our first case this morning is number 2013-1271, Lifescan Scotland Ltd. v. Shasta and Mr. Schaefer. Just hold on one second while we settle down and back there. Okay, you may proceed. Thank you. May it please the court. My name is John Schaefer, and I represent Pharmatech Solutions Instacare, and I will be speaking on behalf of all of the appellants in this matter. And the first thing I'm going to talk about is exhaustion. On my way to court today, I actually went and bought a Lifescan Mini. I now own this product, and I can make any use I want of it. Now, there was a notice on the bottom of the box that said I had to use it with the strips of Lifescan. But Lifescan concedes I haven't agreed to that, and consistent with this court's holding in Hewlett-Packard v. Repeat O. Stencil, made it clear that if I use this meter with the GenStrip, it's not an unauthorized use that would give Lifescan the ability to bring an infringement action against me unless it amounts to a breach of contract. But the problem is, or at least the distinction between the scenario you just described and what's going on in this case, is as you started, you went to a store and purchased this. There was a sale. Yes. And the cases, including Quanta, repeatedly referred to an authorized sale. In this case, however, there was no such authorized sale, was there? There's two instances. You're absolutely right. 60% of the meters are given away. Lifescan gives them to healthcare providers, and those healthcare providers then give them to patients when those patients are diagnosed with diabetes so they can use them. But in that instance, Lifescan intends those patients to use those meters. They intend and authorize those patients to use those meters any manner that practices the 105 patent. So you think the repeated references in the Supreme Court and other cases to authorized sales don't really mean authorized sale. They mean any authorized use or any ownership, receipt of ownership and title in the absence of any consideration or what? No, authorized is the key word, Your Honor. If someone sells something where they don't have the right to do it, they don't have the authority to sell, that is not an authorized sale. So even if I pay money for something to someone, the patentee, patent holder, can still sue me even though I paid consideration to a third party because the patentee had not authorized that sale. And that's consistent when you read Quanta and in particular when you read USV Univis Lens Company. The focus should be on whether there's been a voluntary relinquishment of ownership because this idea of exhaustion, as you know, is a court-made doctrine. So it needs to be read consistent with the Patent Act. And the Patent Act in Section 271A limits a patentee's ability to bring infringement actions to unauthorized uses, makes, or offers to sale. So as long as life scan, as long as you can conclude that my use of the meter is authorized by life scan, then exhaustion should apply. That is reading exhaustion consistent with the Patent Act, which is the way it should be. There's nothing in the Patent Act that talks about an idea of remuneration. And if you limit exhaustion to this idea of remuneration, then you're going to have the instance where life scan has clearly authorized those people who get the meters to use them for free. So while there may be no exhaustion claim, it's absolutely clear under 271A they can't be sued for infringement because life scan has authorized their use. They are not unauthorized users of the device. Counselor, let's go back to your purchasing the meter. Did you purchase any strips for it? No, I did not purchase any strips for it. How did you practice the method then? And that to me is the next important point because you're right. You have those additional elements. But let's say after this hearing, I go and buy strips and I use those strips with the meter. Life scan has now received a reward and I have performed all the functions under the 105 patent. Is there any reason exhaustion shouldn't apply to that? And should you draw a distinction? Let's say I went and at the same time I bought my strip, bought my meter, I bought strips at the exact same time. Do I have exhaustion because I simultaneously made that purchase? Or can they say there's no exhaustion because you bought two different things? This patent is not a patent for an apparatus. It's a patent for a method. So are we talking about practicing a method as opposed to using apparatuses? No, I'm talking about practicing the method. They contend that when I buy their strips and I use their strips with this meter, I am practicing the patent. Under the doctrine of exhaustion, they're entitled to, the doctrine of exhaustion, if they receive a reward, their patent is exhausted with respect to my use of this meter. If there's an exhaustion, would it be to the consumed strips? No, because the patent, as you just pointed out. Counsel, please don't motion during the argument. It's a very important point. As you pointed out, the patent is not to the strips. Or is it to the meter? It's to the method of using the meter with the strips. Right, absolutely. So once I use one strip with the meter, I have practiced the patent. And once I have bought strips and I've bought a meter, I have given LifeScan, to the extent they're entitled to a monetary reward, a monetary reward to practice all of the elements of the patent. So there is no dispute with respect to the systems given away that there's practice of the – that that practices all of the functions of all the elements of this method. What steps of the method does the meter practice? The meter practices what – it practices the elements of the actually measuring of the current and providing the error reading or any reading associated with it. And the strip practices the other – The strip practices all of those other elements. So would you say that the device or the strips embody the inventive features? The inventive features, as we pointed out and argued, the inventive features are found in the meter. Which is comparing the readings from the two strips is your theory? To see if there's something wrong with the strip? Exactly, because that's what the examiner held in his analysis when he allowed this patent. He said that that was the new feature, this measuring feature. And additionally, when you look at the prosecution history, they attempted to get a patent on the strip itself. And they abandoned it. But I'm not sure that under Quanta that the mere fact that the essential step is being performed in the meter is itself sufficient to say that the patent is exhausted when the meter is sold. Because Quanta talks about not only that the inventive aspect of the method is in the first piece of hardware, but it also talks about the secondary pieces of hardware being common or standard parts. And that's not true here, I guess, in one sense. And that these strips, these exact strips, were not common at the time that this patent was granted. But if I understand what you're saying is, well, they may not have been common, but that they were disclosed strips or substantially similar strips were disclosed by the prior art. Am I understanding you correctly? Absolutely. And if they would not be patentable, they cannot be inventive features. But also, there's a key distinguishing… Well, I'm not sure that's true. I'm not sure that the test is whether the strips would be patentable. And I thought, in fact, in your reply brief, you sort of disclaimed that being the appropriate test. I thought that the argument was a little bit different from that, which was that the strips similar to these, in fact, existed in the prior art. And that perhaps you could have even taken those strips and used them with the meter to perform this method patent itself. Exactly, Your Honor. And there is one other distinguishing factor when you look at Quant and all these other cases where they talk about the inventive element. In all those cases, those new component parts, those alternate component parts come from third parties. Here, I buy their strips as well. There's all the elements are there. Yeah, but isn't there a conflict between your expert and their expert as to whether these preexisting strips were essentially the same as the strips under this patent? Essentially the same. If you'd like me to move to the validity issue… No, I don't. No, I'm not talking about the validity issue. I'm talking about the exhaustion issue in this aspect of Quanta that says that the inventive aspect of the method patent has to be in the first piece of hardware. And, I mean, there is some overlap here between obviousness. But my understanding is that the two sides have conflicting experts on the question of whether these prior art strips are similar to the strips we have here or not, right? Which I think is also not only relevant to obviousness but also to exhaustion. Oh, absolutely, Your Honor. And the point that I think is important there, when you look at the prosecution history and the office actions, repeatedly in the office actions, the court consistently citing Nankai, Akeda, Fujimura, is saying, look at all of these elements in this strip. The unidirectional flow, the multiple sensors, the multiple rings, that's all in the prior art. That was done with respect to the… But wouldn't you have to have a – I guess what I'm getting at is there may be a substantial question of patentability here, perhaps, that you say should result in a denial of a preliminary injunction. But we're not in a position to reach a judgment as to whether this aspect of quanta, that is the common availability in the prior art of similar strips, is satisfied, for example, by Nankai because there's conflicting expert testimony about that. The distinction here, though, Your Honor, is what happened with respect to the 714 application. They brought that forward. They abandoned their ability to contend that there's anything there. I think that's a tough argument. I don't – I'm not sure that I see that as what the quanta is talking about. I think quanta seems to be talking about more about whether this second piece of hardware is available in the prior art, was available in the marketplace. And I agree with that, Your Honor. And I would just, again, stress that simple point, which is what makes this distinct is I can buy the strips as well. If I bought the strips simultaneously with the meter, they don't put them in the same box. So isn't that sort of gamesmanship to let them divide their patent in pieces, sell it in different parts, and then say, aha, since I bought one at one time and I bought one at another time, there's no exhaustion? Here, unlike quanta, every single element, whether inventive or not, is resulting in a reward to the – to life scam. In this instance, the judge himself acknowledged that with respect to both the ones given away and the ones purchased, that at points thereafter, the reward will go to life scam because people are buying strips. Well, quanta looked at those secondary components as commodities or off-the-shelf that existed. Here we know that these strips with the two electrodes existed, but the way in which the method uses the strips did not exist. I mean, can't you obtain a patent on a process that is new for – that is a new use for a known machine, for example? You absolutely can. And the issue there, that doesn't make those other fundamental elements of those limitations in the patent new. What makes it new is the adding of those new limitations or elements. But let me get to, since I am beginning to run out – The new limitations or elements being the comparison of the reading from the two working electrodes to see if there's a defect. Exactly. So let me quickly get to the invalidity issue because what really confused me about LifeScan's brief was this comment that they solved the problem that the prior art didn't recognize. The prior art clearly recognized that improvement in accuracy is what is important with respect to electrochemical biosensors like the glucose system here. What you're basically saying on the obviousness issue is that the method of the implanted devices was obvious to carry that over to the out-of-body, if you want to call it that. Exactly, Your Honor. If I could just hit that point for you quickly. That's the FAY patent 752. It specifically discusses a device that reports an error message when the reading between multiple sensors provides a measurement that exceeds a threshold. And it involves the exact same underlying technology of electrochemical biosensors for the measurement of blood glucose. The difference is, as they pointed out, is you have an inadequate fill issue. It doesn't occur in FAY. But when you look at the claims in the patent, the error reference in the claim limitations is not limited to inadequate fill. It's any reportable error. And what's also important to recognize with respect to FAY is we're talking about the meter, not the sensor. So in FAY, you have an implantable sensor. And in the 105, you have a stripped sensor. But they're both being read by a meter. Can I? Yes. Your time's running out. Let me ask you very, very briefly. I just wanted to know what the status of the case was currently. I mean, you've got the PI. You've got two other patents that the district court stayed. Is the proceeding continuing? Have you got a trial schedule? The court actually had set for us a Markman hearing before this hearing. And the judge has continued that Markman hearing until August with the understanding that there would be some Markman advice coming from this court. And I didn't get to talk about that. But maybe I will be able to talk about it in that rebuttal since I'm over my time. So nothing's happened? Nothing. We're doing discovery. And that's the one key point, if I have one second, is that this is a preliminary injunction stage. We've learned a lot since the original preliminary injunction. In fact, the way the system works. But what's most curious is that even when you look at these briefs for the infringement analysis, life scans, citing stuff that wasn't before the court. Okay. Thank you, Mr. Schaefer. We'll give you two minutes for rebuttal. Mr. Discant. Thank you. May it please the court. Let me give you a hypothetical here. Yes, sir. See if we can advance the ball with it. Let's assume that the meters are sold so we don't have the gift aspect of this thing. And let's assume that the strips did exist in exactly the same form in the prior art. Okay. Would this qualify for exhaustion under quanta under those circumstances? Okay. The meter is sold and strips exist in the prior art. I'm just pausing as I'm thinking it through. And the meter is sold at a profit. Can I add that to that variable? The meter is sold at a profit. So that's the first. There's a sale. It's an authorized sale. The questions then are not whether the strips exist in the prior art, but where the essence of the invention lies. And so you would have to analyze that. As I read quanta, it seems to me to basically put the presumption that there won't be an exhaustion when you sell a component of a combination patent, unless the essence of the invention is held in the part you sold and that part has no reasonable non-infringing uses. So you're saying even under my hypothetical, there's no exhaustion? Well, under your hypothetical, assuming the exact same facts that we have with respect to meter and strip. So I'm not making up some other strips. I am assuming other strips. I'm assuming that these strips. Yes. Let's say that Nancar disclosed exactly the same strips. Okay. I've got it. Okay? Yes. In that circumstance, I would say that the heart of the invention still lies in the novel design of the strip for use in this combination. Under my hypothetical, there's no novel design of the strip. The strip is exactly the same strip as disclosed in the prior art. You face, however, the problem of what do you do with the method of use patent. I mean, method of use patents can take things that are known in the art and come up with a novel use for them. And here, the novel use for the strip is the recognition that a strip of this design can gather data which the prior art hasn't perceived. It can gather data that can be analyzed and compared to give an error message. It's the same data as in the prior art. The prior art did not perceive the use. I'm sorry. The comparison of the data appears to occur in the meter. It's not in the strips. The comparison that's the invention occurs in the meter, no? The comparison occurs in the meter because the designer has recognized the strip of this particular design allows it to be collected for this use. So I think it's an incorrect distinction to say all the inventive work is in the meter. I think the inventive work… Well, what unique information is being collected in the strips? I mean, all prior art strips took a measurement of blood glucose and transmitted it to the meter. But they weren't. And is it not the case that what's happening here is that the meter is making a comparison of the readings from two working electrodes to see if there's some problem here? The prior art design, as we posited it in this example, there was a prior art meter strip. But all one did with that prior art strip was collect data and add it up and say this is the outcome. Now, what we're doing is we're using a strip of the same design, hypothetically, and instead of taking the data and adding it up, we're taking separate measurements. There's nothing in the prior art that says you have to take separate measurements. We're taking separate measurements from the two electrodes. We're then comparing the measurements from the two electrodes and only allowing a meter to come out if the electrodes reach the same result. The inventors recognized what the prior art didn't. That by lining up the meters, the electrodes in this way, the blood would traverse them in that order. That you would get accurate results only if you got full coverage of both of the strips. What's the different data that's coming out of the strips? That's what I'm not understanding. It seems to me it's the same data that any working electrode would transmit to the meter. How is the data different? The data, depending on how the prior art strip was actually being used, may or may not be the same. But the invention, in my view, lies in the recognition of what the data that's collected by that strip means and how it can be used. I think it's incorrect. That's what occurs in the meter. The meter does the mechanical work of assessing it. But I would say the invention, the clever idea of this method of use, lies deeply in the design of the strip. Because that's what enables data to be collected that's susceptible to this use. And that is why the inventors spend so much time on the design of the strip. And that is why, when you go to the Patent Office allowance on 1849, of the page or so of discussion, three quarters of it is about the strip. And why the strip design is useful for this purpose and different than the strips in the prior art. They wouldn't patent the strips. That's true. We don't have a patent on the strip. And the reason I would say, if not in the record, I would hypothesize that the reason there's no patent on the strip is because the strip can, as Judge Dyke has hypothesized, have other uses. So, okay, we don't have a patent on the strip. But the question is whether this novel method of use of a strip of this particular design, which does not exist in the prior art, is where the inventive part of the patent lies. And, to me, that's part of the quanta analysis. Another part of the quanta analysis, of course, is whether there are reasonable... Before you go there, Counselor, let me ask you a question. On the exhaustion issue, does it matter that the strips are consumed upon use? Yes, it matters very much. How's that? It matters... Let me back up and answer your question. I think it's gotten lost somewhat in this discussion that we are talking about a method of use patent. And a method of use patent, unless we've exhausted our rights, LifeScan has a right to profit and sell every use. Every time the method is used, the method of use, the owner of a method of use patent is entitled to sell that right, unless the rights have been exhausted. Here, the patent requires a disposable test strip. And that test strip is, in fact, disposed upon use. We sell... We earn no profit on the meters. On the test strips, there is no double dipping. We sell a box of test strips, and for each test strip, we earn a profit. And that profit is related to each use. Okay, so the fact that the strips are consumed upon their use, how does that... What does that do to the application of QANTA in this case? Well, QANTA is interesting because QANTA involved a chip that implicitly had endless use. The life of the chip didn't come into discussion in the QANTA case. I think where you're dealing with a method of use patent in which a component has a limited life that bears on the analysis... Well, I mean, you say it bears on the analysis. Are you suggesting that there can never be exhaustion? No, I'm not. I'm suggesting... So how does it bear on the analysis? Well, it bears on the analysis because you have to look at what's being sold or not sold. For example, here we're selling... In the free pack, there are 10 strips. Let's say there were 100,000 strips. I think one could reasonably say I'm making up the 100,000. But, you know, if the sale consisted of a meter plus sufficient strips for the length of the meter or the length of the patent or some other reasonable marker, then you would say you've exhausted your use patent because you've sold the goods necessary to practice the patent for its life. So the only exhaustion would be if there were sufficient strips to outlive the life, the use of the meter. Is that your view? I think... But in the absence, I mean, if you sell 10,000 strips, but generally a meter can last five years and you might use 12,000 strips... I think that would be one... Then there's no exhaustion. I think that would be one way of looking at it. I think looking at it from our perspective, when we make no profit on the sale of the meters and we earn a single, one profit on the sale of each test strip, that's practicing our patent. That's earning a profit each time the patented invention is used. There's no double-dipping involved. It's a single profit on a single use, a very tight connection between our sales practices and the use. In your theory, it seems to me that what could have been argued in quanta is that there's a new use for the standard components by combining them with this chip. And that therefore the combination of the chip with these standard components doesn't result in exhaustion. It seems to me that exactly the same argument that you're making could have been made in quanta and would have led to a different result there. We are not arguing these are standard components. Well, I understand. But in response to my hypothetical, let's assume that these strips were common. There were millions of strips sold before. And that your invention was figuring out, comparing the signals from the two working electrodes to figure out whether there's a defect. That function is performed. That part of the process is performed in the meter. Under your theory, under that hypothetical, there still would be no exhaustion under quanta, right? I'm sorry, Jake. I've gotten lost. It's my fault. The strips, the exact same strips here, millions of them are being sold at the time the patent application is filed. Your client figures out, let's take these strips. Let's develop a meter that allows the signals from the two working electrodes to be compared so that we can tell whether there's a problem here. Okay? That's the invention. Under your theory, that doesn't qualify for exhaustion either, right? I would agree with you. I think what you've said, if that… I would agree with you. I think I agree. There is no exhaustion? I think there's no exhaustion if the inventive parts of the invention lie solely in the meter and the strips are standard. The strips aren't standard. I mean, the fact that we haven't gotten a patent on them doesn't turn them into standard components. Nothing like them is on the market until these folks enter with their product. Our strips are made specially for use in our meter. There is no prior art strip that's usable in our meter. There's no prior art strip that you could go to a contract manufacturer and say, make that, and you could stick it in our meter. There are no standard parts. They aren't. And I've got to emphasize as well that Quanta looks explicitly at whether there are reasonable non-infringing uses for the… During the prosecution, your application for a patent on the strip was rejected as anticipated. And it wasn't… So, it may be true that you don't have the exact same strip in the prior art, but the technology of using two electrodes to use to obtain special or certain readings, that clearly existed in the prior art. Prior art used two electrodes in different patterns to get different outcomes. But to get accurate readings, they used two electrodes. That existed in the prior art. That existed in the prior art. None of those designs… So, what makes your strip so special? I mean, suppose somebody comes along and designs, has a strip that's got three electrodes, but only two are used. What makes our strip special? Well, answer my question. Let's say you have a strip that's got three electrodes, but only two are used. Does that… Would that infringe the method? If you had a strip with three electrodes, only two of which were used, that were arranged according to the specific arrangements, that is, the two working electrodes had to be upstream and the reference electrode downstream, and there was another non-working electrode that presumably would infringe the patented method. But there is no such meter. I mean, there isn't a test strip that you can point to in the prior art that, when made according to its instructions, is usable in our meter. That just doesn't make sense. So, when we go to apply quanta, what do we look at? Where's the embodiment of the inventive features? Is it in the meter, or is it in the strips? I would say it's between the two. I would say that this is… That quanta, to my mind, as I read quanta, it weighs it… Its presumption is that you don't exhaust when you sell a component of a patented invention. You do exhaust if what you sell is the heart and soul of the invention, the computer chip in that instance. I don't consider the meter the heart and soul of this invention. I don't think… But it embodies the inventive feature. It embodies some inventive features. Why isn't it the heart or the soul or both of the invention? Because the test strip was designed uniquely for this purpose. And it is where… It is, frankly, the clever parts of this use patent lie in the clever design of a particular test strip that may or may not have parallels in the prior art, but the prior art has no conception of such a novel, interesting use of a test strip of this design. And so, it is moved into a different place. It's elevated. It's become a use patent. It's elevated its value by the scientist's recognition that it can be used in this fashion. And then, again, I keep going back to quanta also emphasizes that the piece that's sold have no reasonable non-infringing uses. And we had back and forth on that. And finally, in their reply brief, they say that test strips compatible with life scans meter can be designed without contributing to the infringement of the 105 patent. That's at page 28 of their reply, citing us. Well, we've said that repeatedly, and it's true. So… I think we're about out of time. Thank you, Mr. Diskett. Thank you, sir. My real quick rebuttal. This court not only has to decide this case, but has to provide some guidance to lower courts on how to deal with these issues. And you're faced with an unusual situation here where you have an entity who makes a product. You have photocopy machines just like test strips here where they sell both the part of the product and they sell the consumables that go with it, and they have a method claim here. Under Mr. Diskett's analysis, this court's going to be asked several things. One, when do they get a sufficient reward? I mean, should the court be in the business of defining when a reward is sufficient? And can they just simply avoid exhaustion by separating the two? What's the practical effect? You've got a 60-40 sale, right? 60% of what's on the market was sold together. Yes. And the 40%, so there's a separate issue with regard to the 40%, right, because it was just the sales of the meter. What is the practical implication if we go for you on one of those, the 60% but not the 40%, just the meter? In purposes of the injunction on the balancing of the equities, you now have innocent third parties who would have the right to use our meters. And since those innocent third parties would have the right to use our strips, since those innocent third parties should have the right to use a competitive strip, I think that really changes the balance of equities there. I'd like to hit one last point in my 35 seconds that is left is what is this meaning of reasonable non-infringing use? You get it directly from Quanta, Quanta at page 632. It says, here as in Unilens, the only apparent object of Intel sales was that Quanta permit them to be incorporated into these products. When you're looking at reasonable non-infringing use, you're looking at the intent of the patentee at the time of sale. Did they intend to give that right? There is no question that LifeScan had no intent in the sale of these meters other than for them to practice the method of the 105 patent. So the fact that there are some theoretical other strips that can be designed is irrelevant to their intent because, again, we're going back to Hewlett Packard. We're looking at is there sufficient there for the contractual relationship. Okay. Thank you, Mr. Shaffer. Thank you. Thank both counsel. The case is submitted.